**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MAX ALOBWEDE ETAPE,
   *Plaintiff-Appellant,*

v.

MICHAEL CHERTOFF, Secretary, U.S.
Department of Homeland Security,
   *Defendant-Appellee.*

No. 06-1916

AMERICAN IMMIGRATION LAW
FOUNDATION,
   *Amicus Supporting Appellant.*

SAWSAN ABDUL RAHIM,
                 *Plaintiff-Appellant,*

                 v.

RICHARD CATERISANO, District
Director, Baltimore District Office
U.S. Citizenship and Immigration
Services; EMILO T. GONZALEZ,
Director, U.S. Citizenship and
Immigration Services; MICHAEL
CHERTOFF, Secretary, U.S.                          No. 06-1990
Department of Homeland Security;
ALBERTO GONZALES, Attorney
General, U.S. Department of
Justice,
                 *Defendants-Appellees.*

AMERICAN IMMIGRATION LAW
FOUNDATION,
                 *Amicus Supporting Appellant.*

Appeals from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge.
(8:05-cv-01404-DKC; 8:06-cv-00420-DKC)

Argued: May 22, 2007

Decided: August 2, 2007

Before MOTZ and SHEDD, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Reversed and remanded by published opinion. Judge Motz wrote the
majority opinion, in which Judge Shedd joined. Senior Judge Hamil-
ton wrote a dissenting opinion.

## COUNSEL

**ARGUED:** Thomas A. Elliot, ELLIOT & MAYOCK, L.L.P., Washington, D.C., for Appellants. Jennifer A. Wright, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellees. **ON BRIEF:** R. Scott Oswald, Nicholas W. Woodfield, EMPLOYMENT LAW GROUP, P.C., Washington, D.C., for Appellant Max Alobwede Etape. Rod J. Rosenstein, United States Attorney, Neil R. White, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellees. Mary A. Kenney, Washington, D.C., for American Immigration Law Foundation, Amicus Supporting Appellants.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

We consider here whether a naturalization applicant's timely filing of a petition in federal court pursuant to 8 U.S.C. § 1447(b) (2000) vests the court with exclusive jurisdiction. In these consolidated cases, after the applicants filed § 1447(b) petitions in the district court, the United States Bureau of Citizenship and Immigration Services (CIS) denied their naturalization applications. The district court then dismissed their § 1447(b) petitions as moot, reasoning that the CIS had retained jurisdiction over the applications even after the § 1447(b) petitions had been filed with the court. Because § 1447(b) vests exclusive jurisdiction in the district court, depriving the CIS of jurisdiction to adjudicate an application unless instructed to do so by the district court, we reverse.

I.

Section 1447(b) provides a naturalization applicant with the right to file a petition for hearing in a federal court if more than 120 days have elapsed since the applicant's naturalization examination and the CIS has failed to make a determination on the application. The statute states:

> If there is a failure to make a determination under section 1446 of this title before the end of the 120-day period after the date on which the examination is conducted under such section, the applicant may apply to the United States district court for the district in which the applicant resides for a hearing on the matter. Such court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the [CIS] to determine the matter.

8 U.S.C. § 1447(b).

Both Max Alobwede Etape and Sawsan Abdul Rahim filed naturalization applications with the CIS. When more than 120 days elapsed after their examinations and the CIS had failed to make a determination, both availed themselves of the right to petition in federal court under § 1447(b).

On April 2, 2003, Etape filed his naturalization application. On September 9, 2003, he appeared for his initial naturalization examination. On that day, the CIS issued a continuance letter requesting additional documentation from Etape. On October 6, 2003, Etape filed the additional documentation with the CIS and asked the CIS to resume adjudication of his application. On May 23, 2005, after more than 120 days had elapsed (in fact, more than 20 months had passed) since Etape's initial examination and he had not received a determination from the CIS, he filed a petition in the district court pursuant to § 1447(b). On October 18, 2005, before the district court acted on Etape's petition, the CIS denied his naturalization application.

On January 18, 2005, Rahim filed a naturalization application with the CIS. On June 14, 2005, she appeared for her naturalization examination. On February 17, 2006, after more than 120 days had passed without a determination from the CIS, Rahim filed a petition in the district court pursuant to § 1447(b). On February 28, 2006, again before the district court acted on the petition, the CIS denied Rahim's naturalization application.

In each case, the district court concluded that § 1447(b) did not deprive the CIS of jurisdiction over the naturalization applications

after the applicants filed their § 1447(b) petitions in federal court. Moreover, the court reasoned that its ability to consider the § 1447(b) petitions depended on the underlying naturalization applications remaining undecided by the CIS. Thus, once the CIS denied the applications in these cases, the district court ruled that the § 1447(b) petitions were moot. Accordingly, the district court dismissed both petitions for lack of jurisdiction.

We have consolidated the cases on appeal, and we review *de novo* the district court's grant of dismissal under Federal Rule of Civil Procedure 12(b)(1). *Hawes v. United States*, 409 F.3d 213, 216 (4th Cir. 2005).

## II.

Only one appellate court has considered in a published opinion whether § 1447(b) vests exclusive jurisdiction in the district court. After an *en banc* hearing, the Ninth Circuit concluded that § 1447(b) does indeed vest exclusive jurisdiction in the district court, and so prevents the CIS from further action on a naturalization application after a petition has been filed in court, unless the court remands the matter to the CIS. *United States v. Hovsepian*, 359 F.3d 1144, 1159 (9th Cir. 2004) (en banc).[1]

---

[1]The majority of district courts to have considered the issue have relied on *Hovsepian* to hold that § 1447(b) vests exclusive jurisdiction in the district court. *Compare Kalla v. Chertoff*, No. 1:06-CV-1732-MHS, 2007 U.S. Dist. LEXIS 8324 (N.D. Ga. Feb. 6, 2007) (holding that § 1447(b) vests exclusive jurisdiction in district court), *Meyersiek v. U.S. Citizenship & Immigration Servs.*, No. CA 05-398 ML, 2006 WL 1582397 (D.R.I. Jun. 6, 2006) (same), *Meraz v. Comfort*, No. 05 C 1094, 2006 WL 861859 (N.D. Ill. Mar. 9, 2006) (same), *Zaranska v. U.S. Dep't of Homeland Sec.*, 400 F. Supp. 2d 500 (E.D.N.Y. 2005) (same), *and Castracani v. Chertoff*, 377 F. Supp. 2d 71 (D.D.C. 2005) (same), *with Perry v. Gonzales*, 472 F. Supp. 2d 623 (D.N.J. 2007) (holding that § 1447(b) confers concurrent jurisdiction on the district court and the CIS), *and Farah v. Gonzales*, No. Civ. 05-1944 DWF AJB, 2006 WL 1116526 (D. Minn. Apr. 26, 2006) (same). *See also Epie v. Caterisano*, 402 F. Supp. 2d 589, 591 n.1 (D.Md. 2005) (noting in dicta that courts have held that § 1447(b) "grants district courts exclusive jurisdiction

The applicants naturally rely heavily on *Hovsepian* in support of their argument that a district court has exclusive jurisdiction over a naturalization application after an applicant files a proper § 1447(b) petition with the court. The Government, although it did not petition for certiorari in *Hovsepian*, contends that the Ninth Circuit erred. The Government maintains that § 1447(b) provides the district court and the CIS with concurrent jurisdiction, which permits the CIS to adjudicate an application even while a § 1447(b) petition is pending in district court. The Government further asserts that the district court loses jurisdiction when the CIS makes a determination on a naturalization application.

To resolve this question, we examine the language of the statute, precedent directing the proper interpretation of such language, and the larger statutory context.

A.

1.

As always, we begin with the language of the statute. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). Section 1447(b) instructs that after a proper petition has been filed, a "[district] court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the [CIS] to determine the matter." 8 U.S.C. § 1447(b).

The parties agree that § 1447(b) expressly provides the district court with jurisdiction over a proper petition. The Government contends, however, that the statute only grants the district court jurisdic-

over naturalization applications rather than concurrent jurisdiction with" the CIS); *Pichardo-Martinez v. Ashcroft*, 399 F. Supp. 2d 1043, 1045-46 (D. Ariz. 2005) (recognizing *Hovsepian*'s holding while ruling that § 1447(b) does not grant the district court exclusive jurisdiction if the plaintiff does not ask the district court to review his naturalization application). *But see Kia v. U.S. INS*, No. 98-2399, 1999 WL 172818, at * 1 (4th Cir. Mar. 30, 1999) (holding that § 1447(b) does not divest the agency of jurisdiction).

tion concurrent with that of the CIS because, according to the Government, "nothing in the plain language of the statute" divests the CIS of jurisdiction it had before the lapse of 120 days and the filing of the § 1447(b) petition. We cannot agree. Section 1447(b) provides the district court with two options once it has obtained jurisdiction: to "determine the matter," or to "remand the matter, with appropriate instructions, to the [CIS] to determine the matter." Giving these words their "ordinary meaning," as we must, *BP Am. Prod. Co. v. Burton*, 127 S. Ct. 638, 643 (2006), we can only conclude that a proper § 1447(b) petition vests the district court with exclusive jurisdiction, unless and until the court "remand[s] the matter" to the CIS.

First, although § 1447(b) provides a federal court with "jurisdiction" to "determine the matter," under the Government's view, the district court's power to make this determination can be extinguished if the CIS makes this precise determination first. Indeed, the Government's interpretation of § 1447(b) effectively enables the CIS, an administrative agency, to *divest* a federal district court of its congressionally authorized jurisdiction.[2] Nothing in the statute suggests that Congress intended that an agency could subvert Congress' choice to vest the district court with jurisdiction to "determine the matter" once an applicant files a timely § 1447(b) petition. *See Hovsepian*, 359 F.3d at 1160 ("How can the court 'determine the matter' if the [CIS] has the option to 'determine the matter,' too, and essentially force the court to accept its view?").[3]

---

[2]The dissent contends that "nothing short of Article III, § 2 of the United States Constitution strips a district court of subject matter jurisdiction." *Post* at 25. The dissent misses our point, however, that under the Government's view, agency action *causes* the case to become moot, and the district court to lose its jurisdiction, thus nullifying the statutory grant of authority to the court to determine or remand the matter.

[3]The Government also argues that a district court need not "accept" the CIS's "view" on an application because another portion of the statute, 8 U.S.C. § 1421(c) (2000), provides *de novo* judicial review of a CIS determination denying an application after an applicant has exhausted all administrative remedies. This argument ignores Congress' clear intent to provide an applicant with an *additional* judicial remedy if the CIS fails to act within 120 days. Under the Government's view, a CIS determination (and a late one at that) will force the district court to accept the CIS's view *at the § 1447(b) stage*, and will eliminate the remedy set forth in § 1447(b) by preventing the district court from acting until an applicant files a later § 1421(c) petition.

Even more damaging to the Government's position is the language empowering the district court to "remand the matter, with appropriate instructions, to the [CIS] to determine the matter." The very word "remand" indicates that Congress intended a hierarchy. "'Remand' means 'to send back.'" *United States v. Lee*, 786 F.2d 951, 955 (9th Cir. 1986) (*citing* Black's Law Dictionary 1162 (5th ed. 1979) (*citing Amalgamated Workers Union of the Virgin Islands v. Hess Oil Virgin Islands Corp.*, 478 F.2d 540, 542 n.1 (3d Cir. 1973))). When a court remands a case, it sends the case back to the place from which it came "for purposes of having some further action taken" in the tribunal of origin. *Lee*, 786 F.2d at 955. Accepting the Government's view would ignore this hierarchy established by Congress. Congress would not have granted district courts the power of "remand" — the power to "send back" — if a naturalization application remained with the CIS after the filing of a § 1447(b) petition. For in that situation, there would be no need for the district court to send anything back — because the CIS would have had the matter all along.

Moreover, accepting the Government's view would "severely limit" the district court's remand power, *see Hovsepian*, 359 F.3d at 1160. Congress empowered the district court in remanding to the CIS to provide the agency "with appropriate instructions." Those instructions could of course include directions to the CIS to take a particular course of action on an application, to adjudicate an application within a particular period of time, or to follow any number of other directions. But if we adopted the Government's view, a district court might not retain the power to issue *any* "appropriate instructions" on remand — because the CIS could strip the court of jurisdiction before the remand order became final. We cannot interpret a statute in a manner that would render some of its language meaningless; rather, we must give effect to each portion of the statute, including that providing district courts with the power to "remand . . . with appropriate instructions." *See, e.g.*, *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (a court has a "duty to give effect, if possible, to every clause and word of a statute," and should be reluctant "to treat statutory terms as surplusage") (internal quotation marks omitted).

In sum, the plain language of the statute clearly supports the applicants' position that proper filing of a § 1447(b) petition provides a

federal court with exclusive jurisdiction over a naturalization application.

2.

This analysis of § 1447(b)'s plain language entirely accords with *Brock v. Pierce County*, 476 U.S. 253 (1986). There, the Supreme Court held that a statute that directed the Secretary of Labor to issue a final determination within 120 days, *but did not specify a consequence* for the Secretary's failure to act, did not prohibit the Secretary from acting after the deadline. *See id.* at 258-62. The Court refused to hold categorically that a statutory deadline that did not specify a consequence for failure to meet the deadline could *never* divest an agency of jurisdiction. *Id.* at 262, n.9. Rather, the *Brock* Court directed that *in those circumstances*, a court should look to see if "less drastic remedies [are] available for failure to meet a statutory deadline," and if other sources of congressional intent indicate that Congress nonetheless intended the deadline to be jurisdictional. *Id.* at 260, 262 n.9. *Brock* thus requires that a court consider Congress' intent before concluding that a statutory deadline divests an agency of jurisdiction. When, as here, the consequence of a missed deadline *is* stated explicitly in the statute, and that consequence is to give the affected party the option to seek relief in the federal courts, Congress has evidenced an intent to make the deadline jurisdictional.[4]

Contrary to the Government's suggestion, our precedent does not diverge from *Brock*. In cases like *Brock*, in which a statute contains

---

[4]The Government argues that a holding that § 1447(b) confers concurrent jurisdiction in the CIS constitutes an available "less drastic remed[y]." *Brock*, 476 U.S. at 260. *Brock*, however, only directs courts to search for a "less drastic remed[y]" *if* a statute does *not* impose a clear consequence for the agency's failure to act. Where, as here, Congress has specified a consequence for failure to comply with a statutory deadline, a court cannot substitute a "less drastic remed[y]." In asserting that "[j]urisdiction sharing is by far a less drastic consequence in the circumstances of these cases," *post* at 26-27, the dissent, like the Government, fails to recognize that § 1447(b) clearly provides a consequence for the CIS's failure to act, rendering the "less drastic remed[y]" inquiry inapplicable.

a mandatory deadline, i.e., that the government "shall" take action within a particular time frame, but "fails to specify the consequences of the government's failure to comply with that deadline," we have recognized that "courts should not assume from the statute's mandatory language itself that a jurisdictional requirement was intended, if a remedy for the government's noncompliance less drastic than dismissal is available." *See, e.g.*, *United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1344 (4th Cir. 1994). But we have never held, or suggested, that when a statutory timing provision does expressly provide a consequence for noncompliance it is nonetheless not jurisdictional. *See Holland v. Pardee Coal Co.*, 269 F.3d 424, 432 (4th Cir. 2001) (identifying the "*Brock* exception" as the "canon of construction which instructs against treating statutory timing provisions as jurisdictional, *unless* such a consequence is clearly indicated") (emphasis added) (internal quotation marks omitted)).

Section 1447(b), unlike the statutes interpreted in *Brock*, *Siller*, and *Holland*, clearly prescribes consequences for the CIS's failure to act: upon an applicant's petition, a district court acquires jurisdiction and may either decide the matter itself or remand to the CIS with instructions. As discussed above, these consequences evidence Congress's intent to provide district courts with exclusive jurisdiction upon the filing of a § 1447(b) petition.

Thus, the language of the statute requires us to conclude that § 1447(b) vests the district court with exclusive jurisdiction over a naturalization application, a conclusion that is entirely consistent with the *Brock* rule.

### B.

We note that the statutory context of § 1447(b) also supports this conclusion. Congress enacted § 1447(b) in 1990 as part of an effort to streamline the naturalization process. *See* Immigration Act of 1990, Pub. L. No. 101-649 § 407(d)(14)(B), 104 Stat. 4978, 5044 ("1990 IMMACT"). Prior to 1990, naturalization applicants faced a two-step process for adjudicating their naturalization applications. *See* 56 Fed. Reg. 50475, 50476 (October 7, 1991) (*citing* Naturalization Act of June 29, 1906, 34 Stat. 596). First, the Attorney General, after investigating and examining an applicant, recommended an outcome to the

district court. *See* 8 U.S.C. § 1446 (1988). Then, the district court reviewed the recommendation and either adopted it, modified it, or held a hearing on the naturalization application. *Id.* §§ 1446(d), 1447. Congress thus vested the district court with the power to make the final naturalization determination.

Ultimately, this system proved unworkable because of the backlog it created on district courts' dockets. *See* 135 Cong. Rec. H4539-02 (July 31, 1989) (statement of Rep. Morrison) (noting the "long backlogs in moving through the naturalization process"). Accordingly, with the 1990 IMMACT, Congress attempted to streamline the process by giving the Attorney General authority to naturalize a citizen without permission from the district court. *Id.* (explaining that "this legislation is directed to change that [two-step] process and to create a one-step option which will allow citizenship to be more expeditiously provided to those who qualify"). But in granting the Attorney General this new authority, Congress recognized the long-standing power the district courts had possessed over naturalization applications and so provided in the new statute that district courts retained their power to review an application if an applicant so chose.

Thus, the 1990 legislation ensures that district courts retain the final word on naturalization applications. If the CIS denies an application, an applicant, after exhausting administrative remedies, may petition for *de novo* review in the district court. 8 U.S.C. § 1421(c). *See also* 8 U.S.C. § 1421(b)(1)(A)&(B)("[E]ach applicant for naturalization may choose to have the oath of allegiance . . . administered by the Attorney General *or* by an eligible court.") (emphasis added). Congress included this provision in the 1990 legislation because it did not want to "take away any of the judicial review rights accorded applicants" in the predecessor legislation. 135 Cong. Rec. H4542. Congress included § 1447(b) for the same reason — to ensure that applicants had judicial recourse when the CIS failed to act. Ultimately, "it is the applicant, not the government, who decides the place and the setting and the *timeframe* in which the application will be processed." *Id.* (emphasis added).

Our holding that § 1447(b) vests the district court with exclusive jurisdiction furthers the twin congressional goals of streamlining the process but retaining applicants' judicial rights and ability to choose

the forum that will adjudicate their applications. Contrary to the suggestion of our friend in dissent, *post* at 24, this holding does not in any way diminish the importance of the CIS's expertise in reviewing naturalization applications. The 120-day period under § 1447(b) does not even begin to run until after the initial naturalization examination; because many of the CIS's investigatory functions take place before or during that initial naturalization examination, they always take place well before the district court obtains jurisdiction. *See* 8 U.S.C. § 1446(b) (describing the investigatory methods the CIS can use *during* examination hearings); 8 C.F.R. § 331.3 (2007) (instructing that the CIS "shall conduct a full investigation of any alien enemy . . . either prior to or after the examination on the application"); *id.* § 335.2(b) (directing that a naturalization examination may occur "only after the [CIS] has received a definitive response from the Federal Bureau of Investigation that a full criminal background check of an applicant has been completed"). Thus, Congress has designed a system whereby the CIS can and must employ much of its expertise and resources well before the district court can possibly act. It is only when the CIS fails to evaluate the information it has gathered in a timely manner[5] that a district court may step in, if asked. And even then, the CIS, as a party to any § 1447(b) action, can utilize its expertise by presenting its findings to the court.

If anything, it is our dissenting colleague, not us, who "ignores . . . congressionally bestowed authority," *post* at 25, — that bestowed on the district court. For the dissent fails to recognize that Congress, in the 1990 IMMACT, specifically *retained* district courts' power to adjudicate naturalization applications, at a time when Congress could easily have eliminated that power. Although the dissent worries that district courts lack the "necessary resources and manpower" to conduct appropriate investigations and that our holding will further bur-

---

[5]We recognize, as the Government argues, that current security concerns sometimes make it difficult for the CIS to make a decision on an application within 120 days. But only Congress can lengthen that period; we must interpret the plain language of the statute, which, as discussed above, empowers the district court to either make a determination on an application or remand it to the agency. When the CIS has good reasons for failing to act, certainly a district court has the option to remand the matter to give the agency additional time.

den "strained judicial resources," *id.* at 24, Congress has evinced no such fear. Congress has not only vested district courts with power to intervene when the CIS fails to act in a timely fashion, but has also empowered district courts to conduct full *de novo* review of all naturalization applications. That said, our holding does not "require[ ]" a district court "to expend" judicial resources, *id.* at 24, for § 1447(b) allows a district court to remand a case immediately to the CIS if it so chooses. In sum, our holding in no way undermines the CIS's exercise of its expertise; rather, our holding simply effectuates congressional intent to allow an applicant to choose "the setting and the timeframe," 135 Cong. Rec. H4542, in which his application is adjudicated.

## III.

Finally, we consider the import of our ruling on those applications the CIS has, in fact, adjudicated while a § 1447(b) petition was pending in federal court. The Government briefly asserts that holding that § 1447(b) vests exclusive jurisdiction in the district court during this period necessarily calls into question the validity of all the naturalization applications granted by the CIS after the filing of a § 1447(b) action. This is so, of course, only if our holding applies retroactively to such cases.

The Supreme Court has instructed that in determining whether to apply a rule of law retroactively, courts must take account of three considerations: (1) "whether the holding in question decided an issue of first impression whose resolution was not clearly foreshadowed by earlier cases;" (2) "whether retrospective operation will further or retard [the] operation of the holding in question;" and (3) "whether retroactive application could produce substantial inequitable results in individual cases." *Northern Pipeline Constr. Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 88 (1982) (plurality opinion) (alteration in original) (internal quotation marks omitted); *id.* at 92 (Rehnquist, J., concurring in the judgment) (agreeing with the plurality's retroactivity discussion).

Given these considerations, the Court in *Northern Pipeline* concluded that its holding — that the Bankruptcy Reform Act's broad grant of jurisdiction to bankruptcy judges violated the Constitution —

should not apply retroactively. *See also Am. Trucking Ass'ns v. Smith*, 496 U.S. 167, 185-86 (1990) (noting that the "Court has also declined to provide retrospective remedies which would substantially disrupt governmental programs and functions"). Subsequently, the Court clarified its *Northern Pipeline* holding, explaining that when it "applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in *all cases still open on direct review*." *Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 97 (1993) (emphasis added).

Applying *Northern Pipeline* and *Harper* here, we conclude that our holding should apply retroactively *only* to § 1447(b) cases still open on direct review. In this case, like the *Northern Pipeline* Court, we have considered an issue of first impression, whose retroactive application beyond cases still open on direct review would not only unduly burden the CIS and the courts, but also could upset the rights of numerous citizens whose naturalization applications the CIS previously granted during the pendency of a § 1447(b) petition. Thus, our holding will have retroactive effect only on those § 1447(b) petitions still open on direct review.

IV.

For the foregoing reasons, we hold that the CIS did not have jurisdiction to act when it denied Etape and Rahim's naturalization applications. Accordingly, we reverse the judgment of the district court and remand both cases to that court.[6] On remand, the district court can decide, pursuant to § 1447(b), whether it wishes to "determine the matter" in each case, or whether it wishes to remand the cases to the CIS.

*REVERSED AND REMANDED*

---

[6]The Government has moved to dismiss Rahim's appeal as moot because she continued to pursue administrative remedies while this appeal was pending and has now filed a § 1421(c) action for *de novo* review in district court. Because we conclude, however, that the CIS lacked jurisdiction to take action after Rahim filed her § 1447(b) petition, we deny the motion.

HAMILTON, Senior Circuit Judge, dissenting:

In my view, the district court did not err in dismissing the appellants' respective petitions for § 1447(b) hearings in the district court. *See* 8 U.S.C. § 1447(b). Once the Bureau of Citizenship and Immigration Services denied the appellants' applications for naturalization, the appellants' respective pending actions (based upon their § 1447(b) petitions) became moot for lack of a live case or controversy, thus depriving the district court of subject matter jurisdiction. Accordingly, I dissent.

I.

Prior to October 1, 1991, an alien seeking naturalized citizenship applied for naturalization directly in the district court since district courts had exclusive jurisdiction to naturalize persons as citizens of the United States. *See* 8 U.S.C. § 1421(a) (1990); Immigration Act of 1990, Pub. L. No. 101-649, Title IV, §§ 401, 408(a)(1), 104 Stat. 5038, 5047 (Nov. 29, 1990); *Chan v. Gantner*, 464 F.3d 289, 290 (2d Cir. 2006). To aid district courts in this process, the Immigration and Naturalization Service (INS) investigated naturalization applicants and supplied district courts with a report and nonbinding recommendation. *See* 8 C.F.R. § 335.11 (1990). *See also Chan*, 464 F.3d at 290.

In response to tremendous backlogs of naturalization applications in the district courts, the Immigration Act of 1990 amended the Immigration and Nationality Act of 1952 (the INA), 66 Stat. 163, as amended, 8 U.S.C. § 1101 *et seq.*, to provide that "[t]he sole authority to naturalize persons as citizens of the United States is conferred upon the Attorney General." 8 U.S.C. § 1421(a), Pub. L. No. 101-649, Title IV, § 401, 104 Stat. 5038 (1990) (amending INA to change naturalization from a judicial process to an administrative process beginning October 1, 1991). "A central purpose of the statute was to reduce the waiting time for naturalization applicants." *United States v. Hovsepian*, 359 F.3d 1144, 1163 (9th Cir. 2004) (*en banc*); *see also* 135 Cong. Rec. H4539-02 (Statement of Rep. Morrison of Connecticut) (indicating purpose of statute was to remedy "the problem of long backlogs in moving through the naturalization process once the time period for naturalization has been accomplished and the various requirements of naturalization have been met"); Arnold Rochvarg,

*Report to the Administrative Conference—Reforming The Administrative Naturalization Process: Reducing Delays While Increasing Fairness*, 9 Geo. Immigr. L. J. 397, 398-99 (1995) ("The major reason for the 1991 change to an administrative naturalization process from a judicial one was the backlog of naturalization cases in many courts. This created unreasonable delays in eligible applicants becoming citizens."). Thus, post October 1, 1991, an individual seeking naturalization must file an application with the Attorney General, 8 U.S.C. § 1445, and an investigation and examination is conducted by the Bureau of Citizenship and Immigration Services pursuant to 8 U.S.C. § 1446.[1] In relevant part, § 1446 provides:

**(a) Waiver**

Before a person may be naturalized, an employee of the Service, or of the United States designated by the Attorney General, shall conduct a personal investigation of the person applying for naturalization in the vicinity or vicinities in which such person has maintained his actual place of abode and in the vicinity or vicinities in which such person has been employed or has engaged in business or work for at least five years immediately preceding the filing of his application for naturalization. The Attorney General may, in his discretion, waive a personal investigation in an individual case or in such cases or classes of cases as may be designated by him.

**(b) Conduct of examinations; authority of designees; record**

The Attorney General shall designate employees of the Service to conduct examinations upon applications for naturalization. For such purposes any such employee so designated

---

[1]Pursuant to the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2125, the INS was divided into two different bureaus under the Department of Homeland Security: the Bureau of Immigration and Customs Enforcement and the Bureau of Citizenship and Immigration Services (CIS). *Chan*, 464 F.3d at 290. CIS processes applications for United States citizenship. *Id.*

is authorized to take testimony concerning any matter touching or in any way affecting the admissibility of any applicant for naturalization, to administer oaths, including the oath of the applicant for naturalization, and to require by subpoena the attendance and testimony of witnesses, including applicant, before such employee so designated and the production of relevant books, papers, and documents, and to that end may invoke the aid of any district court of the United States; and any such court may, in the event of neglect or refusal to respond to a subpoena issued by any such employee so designated or refusal to testify before such employee so designated issue an order requiring such person to appear before such employee so designated, produce relevant books, papers, and documents if demanded, and testify; and any failure to obey such order of the court may be punished by the court as a contempt thereof. The record of the examination authorized by this subsection shall be admissible as evidence in any hearing conducted by an immigration officer under section 1447(a) of this title. Any such employee shall, at the examination, inform the applicant of the remedies available to the applicant under section 1447 of this title.

\* \* \*

**(d) Determination to grant or deny application**

The employee designated to conduct any such examination shall make a determination as to whether the application should be granted or denied, with reasons therefor.

*Id.* § 1446(a)-(d).

Additionally, if a naturalization applicant "is a native, citizen, subject, or denizen of any country, state, or sovereignty with which the United States is at war," *i.e.*, an alien enemy, 8 U.S.C. § 1442(a) requires the Attorney General to conduct a special examination to establish the applicant's loyalty to the United States. As a practical matter, the CIS, via federal regulation, is charged with carrying out alien-enemy investigations:

The Service shall conduct a full investigation of any alien enemy whose application for naturalization is pending upon declaration of war or at any time thereafter. This investigation may take place either prior to or after the examination on the application. This investigation shall encompass, but not be limited to, the applicant's loyalty to the United States and attachment to the country, state, or sovereignty with which the United States is at war.

8 C.F.R. § 331.3.

Also of note, beginning in fiscal year 1998, Congress mandated that the Federal Bureau of Investigation (FBI) complete a criminal background check on naturalization applicants before the CIS decides whether to grant or deny a respective application. *See* Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1998, Pub. L. 105-119, 111 Stat. 2448-49 (November 26, 1997) (cited in Historical and Statutory Notes to 8 U.S.C. § 1446). In this same vein, pursuant to an implementing federal regulation, the CIS "will notify applicants for naturalization to appear before a [CIS] officer for initial examination on the naturalization application only after the Service has received a definitive response from the Federal Bureau of Investigation that a full criminal background check of an applicant has been completed." 8 C.F.R. § 335.2(b). In other words, the CIS, by this regulation, is directed not to conduct a § 1446(b) examination of a naturalization applicant, until the FBI has completed a full criminal background check on the applicant.

Pursuant to 8 U.S.C. § 1447(a), if the Attorney General, through the CIS, denies an alien's application for naturalization, the alien has the right to request a review hearing before an immigration officer.[2]

---

[2]Specifically, 8 U.S.C. § 1447(a) provides:

**(a) Request for hearing before immigration officer**

If, after an examination under section 1446 of this title, an application for naturalization is denied, the applicant may request a hearing before an immigration officer.

*Id.*

Pursuant to 8 U.S.C. § 1421(c), if such immigration officer ultimately denies the application, the alien has the right to seek *de novo* judicial review of his application for naturalization in the district court for the district in which the alien resides.[3]

Turning to the section of the Immigration Act of 1990 directly at issue in the present appeal, Title IV, § 407(d)(14), 104 Stat. 5044, codified at 8 U.S.C. § 1447(b), such section authorizes an applicant for naturalization to apply for a hearing on the merits of his application in the district court for the district in which the alien resides if the Attorney General fails to make a determination on such application within 120 days after conducting a § 1446(b) examination. Specifically, 8 U.S.C. § 1447(b) provides:

### (b) Request for hearing before district court

If there is a failure to make a determination under section 1446 of this title [on an application for naturalization] before the end of the 120-day period after the date on which the examination is conducted under such section, the applicant may apply to the United States district court for the district in which the applicant resides for a hearing on the matter. Such court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter.

[3]Specifically, 8 U.S.C. § 1421(c) provides:

### (c) Judicial review

A person whose application for naturalization under this subchapter is denied, after a hearing before an immigration officer under section 1447(a) of this Title, may seek review of such denial before the United States district court for the district in which such person resides in accordance with chapter 7 of Title 5. Such review shall be de novo, and the court shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing de novo on the application.

*Id.*

*Id.* § 1447(b).

## II.

Properly framed, the overarching issue presented in this consoli-dated appeal is whether a naturalization applicant's proper filing of a § 1447(b) petition, in district court, for a hearing on the merits of his naturalization application, immediately and automatically divests the Attorney General of the authority the Immigration Act of 1990 statu-torily conferred upon him to grant or deny applications for naturaliza-tion. With all due respect to the majority opinion's holding to the contrary, the language of the relevant statutory provisions, the spe-cific context in which the language is used, and the broader context of the Immigration Act of 1990 as a whole, compel an answer in the negative.

"The first step in determining the meaning of a statute is to exam-ine the statute's plain language. In doing so, we look at 'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *Andrews v. United States*, 441 F.3d 220, 222 (4th Cir. 2006) (internal citation omitted) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). If the plain lan-guage of the statute itself answers the question, we must enforce the statute as written, without resorting to consideration of the statute's legislative history. *Patterson v. Shumate*, 504 U.S. 753, 759, 761 (1992) (plain language of Code is determinative; turn to legislative history only when statute is ambiguous). If the statutory language at issue is ambiguous, courts "appropriately may refer to a statute's leg-islative history to resolve statutory ambiguity." *Toibb v. Radloff*, 501 U.S. 157, 162 (1991).

To properly analyze the statutory construction question before us, we must first consider the plain language of 8 U.S.C. § 1421(a), which is the statutory provision in which Congress transferred "[t]he *sole authority* to naturalize persons as citizens of the United States" from the district courts to "the Attorney General." *Id.* (emphasis added). Congress effected such transfer (and in such bold terms) in response to the tremendous backlog of naturalization cases pending in the district courts and provided that such transfer become effective October 1, 1991. Immigration Act of 1990, Pub. L. No. 101-649, Title

IV, § 408(a)(1), 104 Stat. 5047. Concomitant with this landmark transfer of authority to decide naturalization applications, Congress provided that naturalization applications "shall be on a form pre-scribed by the Attorney General and shall include averments of all facts which in the opinion of the Attorney General may be material to the applicant's naturalization," 8 U.S.C. § 1445(a), and "shall be filed in the office of the Attorney General,"[4] *id.* § 1445(d). Moreover, acknowledging the expertise of what is now the CIS in immigration and naturalization matters, Congress decisively charged employees of CIS (or an employee of the United States designated by the Attorney General) with the job of personally investigating naturalization appli-cants "in the vicinity or vicinities in which such person has been employed or has engaged in business or work for at least five years immediately preceding the filing of his application for naturalization." *Id.* § 1446(a). For the same expertise-laden reason, Congress ordered that "[t]he Attorney General shall designate an employee[ ] of the [CIS] to conduct [an] examination[ ] upon [an] application[ ] for natu-ralization," *id.* § 1446(b), and the same employee who conducted the examination shall be the one to grant or deny the application "with reasons therefor," *id.* § 1446(d). Furthermore, pursuant to federal reg-ulation, the CIS is charged with conducting alien-enemy investiga-tions when necessary. 8 C.F.R. § 331.3.

---

[4]The sole exception to this filing rule is found in 8 U.S.C. § 1445(e), which provides as follows:

**(e) Substitute filing place and administering oath other than before Attorney General**

A person may file an application for naturalization other than in the office of the Attorney General, and an oath of allegiance administered other than in a public ceremony before the Attor-ney General or a court, if the Attorney General determines that the person has an illness or other disability which—

**(1)** is of a permanent nature and is sufficiently serious to prevent the person's personal appearance, or

**(2)** is of a nature which so incapacitates the person as to prevent him from personally appearing.

*Id.* This exception has no relevance to the statutory construction issue at hand.

As just set forth, the plain language of these quoted statutory sections makes abundantly clear that Congress fervently believed the Attorney General, through the employees of the CIS, who possess unique expertise in the field of immigration and naturalization, is in the best position to decide naturalization applications. It is in the context of this undeniable premise and the equally undeniable premise that Congress, via the Immigration Act of 1990, changed the naturalization process from a judicial one to an administrative one because of the tremendous backlog of naturalization applications in the district courts, that we should consider the meaning in 8 U.S.C. § 1447(b) of the following language: "[A district court with a properly pending § 1447(b) petition before it] has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the [CIS] to determine the matter." *Id.*

I agree with the majority that Congress included § 1447(b) in the Immigration Act of 1990 "to ensure that applicants had judicial recourse when the CIS failed to act." *Ante* at 11. However, I cannot agree that this language either explicitly or implicitly strips the CIS of its authority to decide a naturalization application which had been pending before it, but which had not been decided within the 120-day period after the date of the CIS's § 1446(b) examination.

Certainly, the statutory grant of jurisdiction to district courts to "determine the matter" ensures that naturalization applicants have judicial recourse when the CIS fails to act. Moreover, the statutory grant of authority to district courts to alternatively "remand the matter, with appropriate instructions to the [CIS] to determine the matter," *id.* § 1447(b), gives a district court flexibility in how best to effectuate Congress' intent in enacting the Immigration Act of 1990 to shorten the time it takes a naturalization applicant to obtain a decision. For example, a district court may believe that a remand to the CIS with instructions to decide the matter within a specified time period, for example thirty days, would best effectuate this purpose.

None of this means, however, that the Attorney General, through the CIS, is stripped of his statutorily conferred authority, based upon unique expertise in immigration and naturalization matters, to determine naturalization applications. In the words of the district court below, "[n]othing in the statute strips CIS of its jurisdiction where

more than 120 days has elapsed since a naturalization examination, CIS has not rendered a decision, and the applicant has filed a claim in district court pursuant to § 1447(b)." (J.A. 400). Rather, the language of § 1447(b) itself, the specific context in which that language is used, and the broader context of the statute as a whole, *see Andrews*, 441 F.3d at 222, compels the conclusion that § 1447(b) does nothing more than grant district courts the authority to either decide naturalization applications pending more than 120 days following the CIS's § 1446(b) examination or remand to the CIS with instructions to determine the matter in order to avoid unreasonable delay. The potential escape hatch from delay in the administrative processing of naturalization applications provided by § 1447(b) is just that—a mechanism to spur the CIS to decide naturalization applications or risk such applications being decided outside the agency. Once the CIS has decided a naturalization application pending before the district court on a § 1447(b) petition, the reason for the § 1447(b) petition, to avoid unreasonable delay in obtaining a decision, is moot. As will be discussed more fully below, in the absence of a live case or controversy, the district court is deprived of subject matter jurisdiction and must dismiss the § 1447(b) petition as the district court did in the cases at hand.

Also noteworthy is the fact that reading § 1447(b) as providing the district court with concurrent jurisdiction to decide naturalization applications fully supports Congress' delay-eliminating-purpose of § 1447(b). Specifically, if the CIS has the authority to decide a naturalization application while such application is pending before the district court pursuant to a properly filed § 1447(b) petition and so decides the application prior to the district court deciding the matter or remanding, the administrative process is properly put back on track. In the case of an application grant, the applicant has obtained the relief he sought and the district court case goes away. In the case of an application denial, the application is simply channeled back through the congressionally designed administrative process, which allows a review hearing before an immigration officer, 8 U.S.C. § 1447(a), and then ultimately, if the denial continues, *de novo* review before the district court on a fully developed administrative record, *id.* § 1421(c).

The superior efficiency of *de novo* district court review on a fully developed administrative record, pursuant to § 1421(c), as compared to initial review by the district court on perhaps no record at all or an incomplete administrative record, pursuant to § 1447(b), is obvious. In the case of a § 1447(b) petition, the district court may well be required to expend its already strained judicial resources to complete an investigation of a naturalization applicant in line with the investigatory requirements of § 1446(a), an exercise, for practical and budgetary reasons it is ill equipped to perform. Indeed, a serious flaw in the majority opinion's jurisdiction-stripping analysis is the complete failure of such analysis to recognize the CIS's significant expertise in the field of naturalization to include the necessary resources and manpower to ensure compliance with the requirements of § 1446(a), which section requires "a personal investigation of the person applying for naturalization in the vicinity or vicinities in which such person has maintained his actual place of abode and in the vicinity or vicinities in which such person has been employed or has engaged in business or work for at least five years immediately preceding the filing of his application for naturalization."[5] *Id.* § 1446(a). Furthermore, added to the superior-efficiency-benefit of concurrent jurisdiction, is the not-to-be-overlooked fact that, at the end of the administrative process, a naturalization applicant still has the option for *de novo* review by the district court of his naturalization application. *Id.* § 1421(c).

The majority's position that reading § 1447(b) as providing concurrent jurisdiction to decide naturalization applications impermissibly

---

[5]Indeed, the federal administrative regulation elucidating the requirements of the § 1446(a) investigation provides:

Subsequent to the filing of an application for naturalization, the Service shall conduct an investigation of the applicant. The investigation shall consist, at a minimum, of a review of all pertinent records, police department checks, and a neighborhood investigation in the vicinities where the applicant has resided and [where the applicant] has been employed, or engaged in business, for at least the five years immediately preceding the filing of the application.

8 C.F.R. § 335.1. The same regulation allows the district director to waive the neighborhood investigation portion. *Id.*

strips district courts of subject matter jurisdiction and renders § 1447(b)'s remand-with-instructions-authority meaningless misses the mark by far. First, the majority's framing of the issue before us to ask whether the CIS's grant or denial of a naturalization application strips the district court of its § 1447(b) jurisdiction to decide the same naturalization application completely ignores CIS's congressionally bestowed authority, based upon its unique expertise in immigration and naturalization matters, to grant or deny naturalization applications. Second, nothing short of Article III, § 2 of the United States Constitution strips a district court of subject matter jurisdiction over a § 1447(b) petition, not the grant or denial of a naturalization application by the CIS. Article III, § 2 provides federal courts with jurisdiction only over "cases" and "controversies." U.S. Const. Art. III, § 2. Thus, as a matter of constitutional law, district courts possess § 1447(b) authority to grant or deny a naturalization application and § 1447(b) remand authority as long as the § 1447(b) petition before it presents a live case or controversy as contemplated by Article III, § 2, for "it is well settled that federal courts may act only in the context of a justiciable case or controversy." *Benton v. Maryland*, 395 U.S. 784, 788 (1969).

In *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167 (2000), the Supreme Court reiterated that the Constitution's case-or-controversy limitation on federal judicial jurisdiction underpins the doctrine of mootness. *Id.* at 180. A case is moot when circumstances change during litigation such that there is no longer any case or controversy as contemplated by the Constitution's Article III, § 2. In the same opinion, the Supreme Court reaffirmed the standard for determining whether a case has been mooted by the defendant's voluntary conduct: "'A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id.* at 189 (quoting *United States v. Concentrated Phosphate Export Assn.*, 393 U.S. 199, 203 (1968)). Here, the CIS's action in denying the appellants' respective naturalization applications unquestionably mooted their respective § 1447(b) petitions given that the allegedly wrongful behavior by the CIS—*i.e.*, CIS's failure to decide the appellants' respective naturalization applications within 120-days of their respective § 1446(b) examinations—could not reasonably be expected to recur. Once the CIS has denied the applications, they are denied and the administrative process pro-

ceeds. Thus, it was Article III, § 2, not the action of the CIS in deny-ing the appellants' naturalization applications, which stripped the district court in the present cases of subject matter jurisdiction.

Moving on to address the majority opinion's discussion of *Brock v. Pierce County*, 476 U.S. 253 (1986), in accord with the district court, I believe *Brock* supports not cuts against reading § 1447(b) as providing concurrent jurisdiction. As we stated in *Holland v. Pardee Coal Co.*, 269 F.3d 424 (4th Cir. 2001), "[i]n its *Brock* decision, the Supreme Court pronounced that a statutory provision that an agency 'shall' perform certain functions within a prescribed period 'does not, standing alone, divest the [agency] of jurisdiction to act after that time.'" *Id.* at 431 (quoting *Brock*, 476 U.S. at 266). We noted that "[t]he Court expressed its reluctance to view 'every failure of an agency to observe a procedural requirement [as] void[ing] subsequent agency action, especially when important public rights are at stake.'" *Id.* (alteration in original) (quoting *Brock*, 476 U.S. at 260). In *Holland*, we went on to quote the following passage from *United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339 (4th Cir. 1994) as "illuminating" circuit precedent regarding the proper application of *Brock*:

> [W]here a statutory deadline requiring that the government "shall" take certain action within a particular time frame fails to specify the consequences of the government's failure to comply with that deadline, courts should not assume from the statute's mandatory language itself that a jurisdictional requirement was intended, if a remedy for the government's noncompliance less drastic than dismissal is available. Rather, in such a context, they should examine the "normal indicia of congressional intent," to determine whether Congress meant the provision to be jurisdictional.

*Holland*, 269 F.3d at 431 (quoting *United States ex rel. Siller*, 21 F.3d at 1344). From these instructions, it follows that if Congress pairs a statutory deadline for agency action with a grant of jurisdiction to another as a consequence for failure to meet the deadline, courts should also examine the normal indicia of congressional intent to determine whether Congress meant the provision to be jurisdiction stripping or jurisdiction sharing. Jurisdiction sharing is by far a less

drastic consequence in the circumstances of these cases. The logic of *Brock* and our Fourth Circuit jurisprudence applying *Brock* strongly suggests that when a statutory deadline for agency action written in mandatory terms is paired with a grant of jurisdiction to another if the agency fails to meet the deadline, courts should not assume that Congress intended a jurisdiction stripping consequence, especially when important public rights are at stake. Rather, in such a context courts should examine the normal indicia of congressional intent to determine whether Congress meant the statutory provision to be jurisdiction stripping. As I have already explained, examination of the normal indicia of congressional intent in regard to the statutory question before us clearly and consistently shows intent on the part of Congress to spur the CIS to action, but no intent on the part of Congress that a naturalization applicant's proper filing of a § 1447(b) petition in district court immediately and automatically divest the Attorney General of the authority the Immigration Act of 1990 statutorily conferred upon him to grant or deny applications for naturalization.

III.

To summarize, the language of § 1447(b) itself, the specific context in which that language is used, and the broader context of the statute as a whole, *see Andrews*, 441 F.3d at 222, compels the conclusion that § 1447(b) does nothing more than grant district courts the authority to either decide naturalization applications pending more than 120 days following the CIS's § 1446(b) examination or remand to the CIS with instructions to determine the matter in order to avoid unreasonable delay. In other words, given the plain meaning of § 1447(b), it cannot be said that it strips the Attorney General or the CIS of their authority and jurisdiction to decide a naturalization application simply because an applicant has filed a § 1447(b) petition with the district court. Therefore, the CIS's action in denying the appellants' respective naturalization applications mooted their respective pending § 1447(b) petitions and deprived the district court of subject matter jurisdiction in each instance. Accordingly, I am constrained to dissent from the majority opinion's disposition reversing the district court's respective dismissals of the appellants' § 1447(b) petitions and remanding for further proceedings. Without hesitation, I would affirm the district court's dismissal, for lack of subject matter jurisdiction, of Etape's case.

With respect to Rahim, I would ultimately grant the government's motion to dismiss as moot Rahim's appeal of the district court's dismissal of her § 1447(b) petition. Following the CIS's denial of her naturalization application and while this appeal was pending, Rahim continued to pursue her administrative remedies to include filing a § 1421(c) action for *de novo* review of her naturalization application in the district court. Dismissal of Rahim's appeal is appropriate since exhaustion of her administrative remedies has afforded her the very relief that she seeks in the present appeal, *i.e.*, the district court's ability to consider the merits of her naturalization application *de novo*.

In short, I would affirm the district court's dismissal of Etape's § 1447(b) petition for lack of subject matter jurisdiction and grant the government's motion to dismiss Rahim's appeal as moot.